Totten, J.
delivered the opinion of the court.
The prominent and leading facts of this case, as they appear in the bill, and are admitted by the demurrer, are these: The complainant was incorporated by the legislature of Ohio, in the year 1834, with plenary powers as an Insurance and Trust Company, and with power to receive money in trust, and to accumulate the same at interest, and to allow such interest thereon as may be agreed on: to accept and execute all such trusts of every description as may be committed to it by any person whatever; to buy and sell drafts and bills of -exchange; and in a word, power to make and execute on its part the contracts and agreements set forth in the bill.. The complainant established an agency called a “Transfer Office,” in the city of New York, and one Wm. M. Yermilye was its agent and cashier at said office from 1843 until nearly the end of the year 1848. There was no law in the State of New York, prohibiting the complainant to exercise any of its functions and powers aforesaid in said State.
The Merchants’ Insurance and Trust Company of Nashville was incorporated in 1840, with a capital stock of $100,000, and to have the same rights and privileges as the Knoxville Marine Fire Insurance and Life and Trust Company, incorporated in January, 1838. The rights, powers and responsibilities created by this charter, will be more fully considered and stated hereafter.
The stock having been promptly subscribed, $25,000 only were paid in, and the balance secur-ed by note or otherwise to the corporation, and it commenced and continued in business under its charter, or in the name of its charter. It is further charged, that the said $25,000, so paid in, were afterwards refunded out of the profits and dividends; and the balance of the stock, if paid at all, was likewise paid out of the profits and dividends of said company. That soon after this com *4 pany was incorporated, it established agencies at New Orleans and Philadelphia, at which agencies and at the principal office in Nashville, it assumed and exercised the business and functions of banking; by dealing in exchange, buying and selling the same; by issuing checks or drafts upon Nashville, New Orleans, New York, and elsewhere, ’and receiving money therefor; by buying and selling bills of exchange and promissory notes; by receiving money on deposit, and by borrowing money, at interest. That said corporation also did a considerable business as an Insurance and Trust Company, properly and legitimately within the provisions of its charter. That a very large and extended business was done by said corporation; its semiannual dividends often amounting to twenty-five per cent, on its nominal amount of capital stock. It is further stated, that in March, 1846, a bill was filed in chancery at Nashville, in the name of the State of Tennessee, against said Merchants’ Insurance and Trust Company of Nashville to enjoin it and its agents from dealing in bills of exchange and other banking business; on the 12th of May, 1847, a decree was made granting such injunction, and on the 30th December, 1847, it was affirmed in the Supreme Court. That notwithstanding said corporation was thus notified by said bill that it had no power under its charter to deal in exchange, receive money on deposit, and in a word, to perform the functions of a bank as before stated; it continued the same business as it had done before the institution of said suit, until it finally suspended in October, 1847. The bill charges that the stockholders were advised of the nature and character of the business done by said corporation as before recited; and states various facts and circumstances, from which it is insisted, such knowledge on the part of the stockholders, may be inferred.
The bill then proceeds to state the nature of the claims and demands of the complainant against the Merchants’ Insurance and Trust Company at Nashville and its stockholders. These *5 claims and demands originated in contracts and agreements made and entered into by Caleb C. Norvell, as agent at Philadelphia of the Merchants’ Insurance and Trust Company of Nashville, and Wm. M. Vermilye, as agent and cashier at the Transfer office in the city of New York, of the Ohio Life Insurance and Trust Company. The powers and authority conferred on said Norvell as such agent, are contained and set forth in the power of attorney exhibited in the bill; it is dated 18th May, 1846, and was to take effect in the discretion of said Norvell on the 1st July, 1846; it was so authenticated as to be admitted to record at Philadelphia, under the registry laws of Pennsylvania, and was accordingly recorded there, and a copy of it placed at New York for the inspection of said Vermilye.
It appoints said Norvell the true and lawful agent of said Merchants’ Insurance and Trust Company, and “empowers him in the most ample sense and manner for said company, and in their name to do and perform all acts of every description whatsoever, which in his judgment or discretion he may deem necessary, convenient or useful for the transaction of their business; the said company hereby ratifying and confirming the same, and the signature and endorsements of said C. C. Norvell, agent, to all instruments of writing whatsoever, and his negotiations and contracts are hereby declared to be as binding upon the said Merchants’ Insurance and Trust Company at Nashville, as though the same had been made by the board of President and Directors, signed by their President and •Secretary, and sealed with their common seal at their office in Nashville;” with power also to appoint a sub-agent and assistant, which was accordingly done. The said Norvell assumed said agency about the 1st July, 1846, and continued in it until the suspension of said company in October, 1847, and during the same period and before that time, George McGregor, was agent of said company at New Orleans.
*6 It became desirable to said company in the course of its business, at Nashville, New Orleans and Philadelphia, of the character and description before mentioned, to open an account with the complainant at its Transfer office in New York, and to get it to perform certain agencies connected with the collection and disbursement of funds at that place and in Europe. An agreement to effect these and other objects connected therewith, was made on the 17th October, 1846, by C. C. Norvell, as agent of the Merchants’ Insurance and Trust Company, and Wm. M. Vermilye, as agent of the Ohio Life Insurance and Trust Company; and this agreement and arrangement continued to be acted upon by the parties until the suspension of the former company, which occurred as before stated in October, 1847.
In compliance with this arrangement, said Wm. M. Ver-milye, as agent and cashier of complainant, at said Transfer office in New York opened a business account with and in the name of said Merchants’ Insurance and Trust Company of Nashville, placed the funds and assets of said company, which came to his hands to their credit, and held the same subject to the checks or drafts of George Crockett, President of said Company at Nashville, George McGregor agent at New Orleans, and C. 0. Norvell agent at Philadelphia; the checks or drafts not to exceed “sixty days sight” or “seventy days date.” The whole account was to be under the superintendence of said C. C. Norvell, and “to be made good to the Ohio Company as to payments and safe as to acceptances” by the agency at Philadelphia; the payments to be reimbursed by cash and the acceptances secured with good paper or other collaterals equal thereto. A specific compensation was to be made to the said Ohio Company for its services and responsibilities for and on account of said Tennessee Company.
Funds and drafts, bills and other securities for funds, were placed in the hands of said Vermilye as agent of the complainant *7 by said Merchants’ Insurance and Trust Company through its operations mainly at New Orleans; the proceeds to be placed to credit of said account.
In some instances, bills on England were sent by Norvell to his own correspondent in England with directions to collect them, and hold proceeds subject to Yermilye’s order. The following letter from Norvell to Vermilye, dated November 25th, 1846, will explain the nature of some of the European transactions, which grew out of said arrangement: “I herewith hand you a letter addressed to our London correspondents, Messrs. A. A. Gower, Nephews & Co., enclosing for your use and credit bills sterling, £5943.13.2, which we propose to debit you on Foreign exchange account par value, say $26,413 62, subject to such premium as you may realize on your drafts on Messrs. Gowers, less your commission i per cent. Should we hereafter send you drawn bills on London, with a request to endorse and sell the same in New York, we shall expect to pay you some commission, but free of brokerage. Our subsequent remittances to Gower & Co., for your use and credit, will be made under cover to you, that you may debit them with such bill from my letter. You will observe from my general instructions to them, that I have requested them to protect my indorsement in case of default. In other words, to charge my account, and not yours, with any bill that may go wrong. You will also consider me as guaranteeing to your company, in behalf of my own, the solvency and promptness of our London correspondents.”
Such is the general character of the operations, by which the Merchants’ Insurance and Trust Company provided credit and funds in the hands of Wm. M. Yermilye, agent and cashier at said Transfer office in New York.
Now said company availed itself very largely of this arrangement at its office in Nashville, at its agency in New Orleans, and at its agency in Philadelphia, by checking and *8 drawing drafts and bills, upon said funds and credit. The transactions of the parties growing out of said arrangement were numerous, complicated and in some instances for large amounts; and involve an account of mutual credits and debits. A great part of the account relates to the operations of the parties in sterling and other European bills, derived ■ mostly through the defendant’s agency at New Orleans, and placed by said Norvell in the hands of his London correspondents Gower & Co., as security for advances made, and to be made by said Wm. M. Vermilye, cashier as aforesaid, and for his acceptances; and in order to raise a fund in hands of Gower & Co., on which said Vermilye might draw, to reimburse him on said general account.
Sometime in the year 1847, the said Gower & Co., at London, became bankrupt and were declared bankrupts by course of legal proceeding in England, and their assets yielded to their creditors a dividend of only one shilling and sixpence in the pound sterling. On this account very heavy losses were sustained by said Merchants’ Insurance and Trust Company, and large liabilities were incurred and payments made by the Ohio Company, for and on behalf of said Merchants’ Insurance and Trust Company, in transactions growing out of said arrangement, for which the latter Company is liable in account to the former, and on these and other accounts set forth and stated in the bill, and all growing out of said arrangement, the Ohio Life Insurance and Trust Company claims of the Merchants’ Insurance and Trust Company the sum of $447,227 33.
On the 6th January, 1848, the President and Directors of the Merchants’ Insurance and Trust Company, executed a deed of assignment to Adrian V. S. Lindsley and Daniel B. Turner, upon the trusts and specifications in said deed mentioned, of all the property and effects, money, accounts and choses in action, of every description of said corporation; *9 schedules of which are annexed to said deed. From these schedules it appears, that the nominal assets of said corporation amount to $386,710 14, and the liabilities to $410,823 25, showing an excess of liabilities over the nominal assets to the amount of $24,113 11. The account with the Ohio Company is not taken into the above estimate, nor is it expressly or in fact provided for in said deed, as it is very evident, that the preferred claims.will more than exhaust the entire assets named in the assignment. The capital stock is not named in the assignment or in the schedule of assets, nor does it appear to have been preserved in any permanent or specific form; but on the contrary, the bill charges, that so far as it had been paid in, it had been refunded to the stockholders out of the profits and dividends of the corporation, in the course of its said operations.
The bill makes the Merchants’ Insurance and Trust Company, in its corporate character, and the persons designated as the stockholders of said corporation, and the trustees named in the deed of assignment, defendants; and it prays, first, for an account, and that the corporation and the persons designated as its stockholders, be compelled to pay plaintiff the sum which may appear to be due on taking the account; or if those persons should not be deemed liable on the grounds assumed in the bill, that is, liable in their private capacity on the grounds of fraud and partnership, then it prays that said stockholders be held liable to the extent of their capital stock; and further, that the deed of assignment be declared fraudulent and void, or if not void for fraud, that nothing passed thereby, and that the assets of the Company be brought into the account for the benefit of creditors.
At the hearing of the ease, several questions were raised and very ably argued. In proceeding to dispose of them, we shall inquire.
1st. Is the complainant repelled from a court of equity by *10 any illegality in the transaction stated in the bill, and its connection therewith?
2d. If not so repelled, to what extent and in'what manner, are the defendants, or any of them, liable?
3d. Is the bill multifarious?
1st. As to the question of illegality; we will first ascertain the nature of the rule relied upon, with its modifications and exceptions, and then consider of its application to the present case; for in the views we take of it, the case turns upon one of the modifications óf the rule.
The general rule is, that no action or suit can be maintained either at law or in equity, upon any contract or agreement made in violation of law; and such contract or agreement is held to be void, because of the illegality. If the contract stand opposed to the common law or statute law, it is equally void, ah initio in the one case, as in the other, and no action or suit will lie to enforce it. This rule being well grounded in reason and authority, is steadily upheld by the courts both in England and the United States, with proper and reasonable exceptions, which we shall presently notice. It matters not in what manner the illegality shall appear, whether on the face of the contract, or by the plea of the defendant; nor what may be the nature or form of the contract, its effect is to annul and dissolve the contract, so far as relates to any remedy upon it, and to leave the parties in the condition in which they placed themselves. 1 Com. on Con. 302, Kent Com. Lec. 39, p. 366; Pothier on Obligations, App.; Collins vs. Blantein, 2 Wilson, 347, S. C. 1 Smith’s Leading Cas. 167, and note. Bartee vs. Coleman, 4 Peters R., 184. Griswold vs. Waddington, 16 J. R., 487. Hale vs. Henderson, 4 Hum., 200.
But the rule goes no further than merely to deny to the parties, any remedy upon their illegal contracts; it relates to the remedy alone; and therefore, a sale of-property upon an illegal consideration, or a fraudulent consideration, has the effect to *11 pass the title to the vendor. But the parties to such contracts, are left without legal protection or remedy, as against each other, either to enforce the contract, or for a breach of any of its stipulations. Worcester vs. Eaton, 11 Mass. R., 375; Yerger vs. Rains, 4 Hum. R. 259.
A contract is illegal at common law if it violate good morals, or is opposed to public policy, or is infected with fraud; and it is also illegal, if it violate the provisions of a public statute. Mr. Kent, in his commentaries says: “Contracts are illegal, when founded on a consideration contra bonos mores, or one against the principles of sound policy, or founded in fraud, or in contravention of the positive provisions of some statute law.” 2 Kent Com. Lec. 39, page 466.
Now as to contracts which contravene the provisions of a statute, the objection of illegality is equally fatal, whether the prohibitions of the statute, be expressed or implied, as where a statute does not in express terms, prohibit a thing to be done, but only imposes a penalty on the person doing it; any contract which contravenes this implied prohibition, will be held illegal. Bartlett vs. Venon, Carth. 252; Begrim vs. Armstead, 10 Bingh. 110; Smith on Con., 151; l Smith’s Leading Cases, 168, note.
Whether the contract be malum prohibitum or malum in se, seems not to be material, as in either case, the courts will refuse to enforce it, and upon this reasoning, “that there can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal.” So in Collins vs. Blantein, 1 Smith’s Leading Cases, 166. Wilmot, Ch. J, says: “I think there is no difference between things made void by act of Parliament, and things void by the Common law. Statute law and Common law both originally flowed from the same fountain, the Legislature. I am not for giving any preference to either, but if to either, I should be for giving it to the Common law.” See also Bank of U. S. *12 vs. Owens, 2 Peters, 538; Watts vs. Brooks, 3 Ves. Jr., 612; Aubut vs. Maze, 2 B. & P. 317.
But where the contract is not sought to be enforced, but is repudiated and disaffirmed, a different rule may and often does apply; and the party will, in many circumstances, be entitled to the remedial action of the courts, to recover back the money or consideration paid, or to cancel securities given, upon illegal and void contracts. It is not an easy matter, in view of conflicting authorities, to state in distinct propositions, the various cases in which the party shall be held entitled or not entitled to this relief.
Mr. Story in his Eq. Jur., sec. 298, says: “that where agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party, who isparticeps criminis, is not in equity material. The reason is, that the public interest requires that relief should be given, and it is given to the public through the party. And in these cases, relief will be granted, not only by setting aside the agreement or other transaction, but in many cases, by ordering a repayment of the money paid under it.”
Again, in sec. 300 of the same work, Mr. Story further says: “that where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, imposition, hardship, under influence or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offence.”
' In 2 Com. on Con., 109, a distinction is taken in this respect between contracts executed and executory, but it is admitted by the author that the distinction is not of general application, but is itself subject to exceptions.
Without going father into detail, we think it may be de *13 duced from the premises and the authorities cited; that if the contract involve moral turpitude, the parties to it are to be held and deemed as in pari delicto, and the courts will not undertake to define and distinguish their relative guilt. In such case therefore, it is a general rule, that no relief will be granted, whether the contract be executed or executory; if it be executory no action will lie to enforce it; if executed, that is, if money be paid upon it, no action or suit will lie to reclaim it. Worcester vs. Eaton, 11 Mass. R. 375.
In the next place, if the contract be in violation of public policy, as declared either by the Common law or Statute law; then the courts are. mainly governed by the consideration of what is due to that public policy, and what will be most likely to promote it. In such case, if the parties be in pari delicto, and the contract be executed, they are left without remedy; if it be executed, and the parties be not in pari~ delicto, relief will, in general, be granted in disaffirmance of the contract, and the claims to justice, such as they are, of the less guilty party, will be reconciled with the claims of public policy; if it be executory, it is the general rule to grant relief against it; and in a court of equity to cancel any notes, bonds or other agreements, founded upon such illegal contract, and to order any money, or other thing paid upon it, to be refunded; and in a court of law, the party has remedy to recover back any money paid upon such illegal executory contract, proceeding upon the ground of its disaffirmance. And this relief against executory contracts, made in violation of public policy is granted or allowed, without regard to the circumstance, that the parties are or are not in pari delicto. Holman vs. Johnson, Cowper, 341; Howzon vs. Hancock, 8, T. R. 576; Vandyck vs. Hewett, 1 East. 96; Browning vs. Morris, Cowper 792; Jacques vs. Withy & Reid, 1 H. Black, 65; Aubert vs. Walsh, 3 Taunt, 282; Utica Ins. Co. vs. Kip, 8 Cowen R., 20; Lowry vs. Bordien, 2 Doug. R., 470; Law vs. Law, 3 P. Will. 392; Morris vs. *14 McCullough, Ambl. R., 433; St. John vs. St. John, 11 Ves., 535; Musson vs. Fales, 16 Mass. R., 333; Greenwood vs. Curtis, 6 Mass., 380; Arden vs. Patterson, 5 J. C. R., 49.
In St. John vs. St. John, 11 Ves. 533, Eldon, the Ld. Chancellor, says: “the authorities go to this, that where the transaction is against policy, it is no objection, that the plaintiff himself was a party in that transaction, which is illegal.” In Shirley vs. Ferris, in the court of Exchequer, the case of a marriage brocage bond, the plaintiff was a party to the transaction, particeps criminis, but the court held, that where the relief is upon the policy of the law, that is not material; the public interest requires that the relief should be given, and it is given to the public through the party.
Now in what circumstances may it be said, that a party to an illegal transaction, is in pari delicto? This question will be best resolved by referring to some of the cases. In Browning vs. Morris, Cowper 792, Ld. Mansfield says: “where contracts or transactions are prohibited by positive statutes, for the sake of protecting one set of men from another set of men; the one from their situation or condition being liable to be oppressed or imposed upon by the other, there the parties are not in pari delicto; and in furtherance of these statutes, the person injured, after the transaction is finished and completed, may bring his action and defeat the contract.” In conformity to this principle, it has been held, that premiums paid for insuring lottery tickets, contrary to the statute, 17 Geo. 3, ch. 46, may be recovered back. Jacques vs. Golightly, 2 Black R. 1073. In this case, the court say, “the statute is made to protect the ignorant and deluded multitude, who in hope of gain and prizes, and not conversant in calculations, are drawn in by the office keepers.” So, if a creditor take money as a consideration for signing a bankrupt’s certificate, contrary to the statute of 5 Geo. 2, ch. 24, sec. 17, the bankrupt, after having obtained his certificate, may recover it back. Smith vs. Brom *15 ly, 2 Doug., 696 note. So if usurious interest be paid, it may on the same principle be recovered. Now, in these several cases, it will be observed, that the money was paid on agreements made in violation oí public statutes; yet, as they were made to protect one class of persons against another class, and as there was an inequality in the condition of the parties, in reference to the transactions, it was held that, although in delicto, they were not in pari delicto. Osborne vs. Williams, 18 Ves., 382, was decided upon the same principle. The agreement in that case, was held to be illegal as being a fraud upon the post office. Sir Wm. Grant, in delivering his judgment, observes, that ‘courts’ both of law and equity, have held that two parties may concur in an illegal act, without being deemed to bo in all respects, in pari delicto. In Goldsmith vs. Bruning, 1 Equity Ca. Ab. 89, a marriage brocage case, the party obtaining money by the sale of her influence, must have been considered as more criminal than the purchaser; for she was decreed, first at the rolls, and afterwards upon appeal, to refund the sum which she had received. The case of White vs. Franklin Bank, 22 Pick. R., 181, was also decided on the same principle. That case was on a contract by the Bank to pay money at a future day certain, in contravention of the express provisions of a public statute. The court say: “the prohibition is particularly leveled against the Bank, and not against any person dealing with it. In the words of Ld. Mansfield, the statute itself by the distinction it makes, has marked the criminal. The plaintiff is subject to no penalty,but the defendants are liable for the violation of the statute, to a forfeiture of their charter. To decide that this action cannot be maintained, would be to secure to the defendants, the fruits of an illegal transaction, and would operate as a temptation to all banks, to violate the statute by taking advantage of the unwary, and of those who have no actual knowledge of the existence of the prohibition of the statute, *16 and who may deal with a bank without any suspicion of the illegality of the transaction on the part of the bank.'’ This case is referred to and approved in Atlas Bank vs. Nahant Bank, 3 Met. R., 585.
In view of the authorities therefore, we assume the principle to be, that if a party acting under circumstances of necessity, or hardship, or imposition, or great inequality of condition, enter into a contract in violation of a rule of public policy, intended for his advantage and protection, it is to be considered, that although he is in delicto, he is not in pari delicto, and in such case he will be entitled to recover back what he may have paid to the other party, or he may have his contract cancelled, as the case may require. Hunter vs. Agee, 5 Hum. R., 57; Coventry vs. Barton, 17 J. R., 142; Musson vs. Bales, 16 Mass. R., 532; Smith on Contracts, 190.
As to the extent and limits of the rule, which denies any remedy upon illegal contracts, it is material to observe, that it does not apply, unless the contract grow immediately out of, and be connected with the illegal act. Armstrong vs. Toler, 6 Cond. R. U. S., 302. Accordingly it was held in Faikney vs. Reynous, 4 Burr, 2069, that if one person pay the debt of another at his request, an action may be sustained to recover the money, though the original contract was unlawful, and that fact known to the plaintiff when he discharged it for the defendant. So in Hodgson vs. Temple, 5 Term R., 181, it was held, that the mere selling of goods, knowing that the buyer will make an illegal use of them, is not sufficient to deprive the vendor of his just right of payment, but to effect that, it is necessary that the- vendor should be a sharer in the illegal transaction. See also Holman vs. Johnson, Cowper, 341; Greenwood vs. Curtis, 6 Mass. 380; Story’s Conflict of Laws, sec. 249; and 4 Peter’s R., 410.
In Withnel vs. Jones, 3 B. & Ad., a distinction is taken between illegal contracts and another class in which the con *17 tract itself does not violate the statute, but some incidental illegality occurs in carrying it into effect. In these latter cases, the contract is good, and may be made the subject of an action, notwithstanding the breach of the law, which has occurred in carrying it into effect. Smith on Contracts, 151.
In the next place, we shall ascertain the effect of the principles here stated, upon the case now before us; but in so doing, it will be necessary, first to consider of the rights, powers and restrictions which properly appertain to the corporation in question. It is chartered by the act of 1840, ch. 60, entitled an act to extend the act of 1837-8, ch. 206; and the first section provides, “that the provisions of the twenty-first section of the aforesaid act, equalizing the rights and privileges of the insurance companies of this State, be extended to a body politic and corporate, hereby created by the name and style of the “Merchants’ Insurance and Trust Company of Nashville.”
The act referred to is the charter of the Knoxville Marine Fire Insurance and Life and Trust Company, and its twenty-first section is as follows: “That all rights and privileges granted by this act, which have not heretofore been granted to any of the existing insurance companies of this State, shall be and the same are hereby granted to them, and that any right or privilege heretofore granted to any existing insurance office in this State, is hereby extended to the corporation herein created, so as to place all institutions of the same kind on the same footing.”
It is this section that confers upon the Nashville Company their corporate powers, rights and privileges, and these are to be found in the charter of the Knoxville Company.
In construing this statute, it is material to observe its obvious and evident intention to place all insurance companies on a footing of equality; and though “rights and privileges” are
the words employed in the former part of the section, yet in *18 order to give effect to the intention, it must he understood as • implying responsibilities, obligations and duties also, otherwise, the insurance companies would not be, as they were intended to be, on a footing of equality.
The rights and privileges of the Knoxville Company are granted upon certain terms and conditions, obligatory upon the company and material to the public interest, without which, it is to be presumed, that no such grant would have been made. Now it seems to us, a technical and unreasonable construction of the statute to say, that it intended to confer upon the Nashville Company similar rights and franchises, and not to impose similar obligations and duties, when it is the declared intention, to place the companies on a footing of perfect equality. We are of opinion, that the Nashville Company, in receiving the rights and franchises, incurred also the obligations and duties stated in the charter of the Knoxville Company.
We shall refer to those rights and obligations so far only as may be material to the case before us. The corporation has power, 1st, to make insurances without limit or restriction; 2d, to accept and execute all such trusts of every description, as may be committed to it by any persons whatsoever, or may be transferred to it; 3d, to hold real estate and sell the same, so far as may be necessary to protect its rights and interests; 4th, to invest any part of its capital stock, money, funds or other property, in any stocks in the United States, and the same to sell and reinvest at pleasure; or it may loan the same on real or personal security, as may be deemed best; 5th, to establish agencies in Tennessee or elsewhere; and 6th, a general power “to do and perform all other things, necessary to promote these objects.”
At the same time it incurs the following obligations and restrictions: 1. The individual property, both real and personal, of every stockholder in said institution, shall be held and *19 bound for the payment of the debts of said corporation, to the full amount of his or her stock in said corporation; 2. It shall not be authorized to issue “bills of credit” or “exercise banking privileges,” or put in circulation any note, draft, check or change ticket intended or the tendency of which will be, to circulate as change or currency; 3. It shall not make or effect any insurance, until the whole of its stock shall have been taken and secured, and twenty-five thousand dollars oí it paid in.
Now, it is objected on the part of the defendants, that the complainant has no right to the ai d of the court for relief, because of the illegality of the transactions stated in the bill. The illegality, it is said, consists in this, that the Merchants’ Insurance and Trust Company of Nashville, contrary to its charter, and against its express prohibitions, was engaged in the business and pursuit of banking, by borrowing money, receiving deposits, drawing drafts and checks, and dealing in exchange as a business and for profit. That whilst engaged in this business, said corporation by it's agent, entered into the agreement and had the transactions stated with the complainant, out of which its claims originate. That these transactions were in themselves, a dealing in exchange in contravention of the provisions of the charter of the Nashville Company. And therefore, because the claims of the complainant originate in these illegal transactions, it will be repelled from the court and no relief be granted.
We have before stated the principles and distinctions deemed applicable to this subject; it only remains very briefly to apply them.
But in the first place, it is material to ascertain the rights and powers which the corporation may lawfully exercise. Its franchise is a grant of general and plenary powers as an in-sur anee and trust company; it cannot be extended by construction to any other object or business, but is confined strict *20 ly to the terms of the grant. / As to the mode and means by which this franchise shall be used and enjoyed; that is entirely a different matter, and it depends upon the charter also, so far as it contains any provisions on the subject, and if none or where it may be silent, then upon the general law applicable to corporations and natural persons. If the charter prescribe a given mode or means, by which any of the rights it confers upon the corporation, shall be used and enjoyed, then it shall in general be confined to the mode or means specified, to the exclusion of any other, though ever so desirable or convenient. The reason is, that it is the creature of its charter, and must look to it for its faculties and functions. Another reason is, that its owners, the persons for whom it acts, are in the possession of an exclusive privilege and franchise denied to others, and therefore, it is not reasonable that it should be extended to the prejudice of others by what might be called a liberal construction, but that it be confined strictly within the limits of the grant. We may further observe, that if the doctrine of constructive franchises were admitted in corporate law, it would be a difficult matter to define their limits, or to check encroachments upon rights and privileges, that should be enjoyed in common by others. The rule of strict construction may be considered the settled doctrine of both the English and American cases.
The charter in question, grants to the corporation plenary powers as an Insurance and Trust Company; this is its franchise, and it has no other.
It cannot exercise the right of banking, because that right is not included in the grant as one of its franchises, and this disability exists without reference to the prohibitions contained in the charter. Then as to the mode and means by which the conceded franchise may be used and enjoyed, and as to the mode and means by which the incidental right to use the stock before stated, may also be used and enjoyed, we are *21 first to look to the charter, and if it contain any special provisions in these respects, they must he pursued, or if it contain any special prohibitions, they must be obeyed; but in the absence of either, we must look to the general law. The charter, after conferring the general franchise, provides that the corporation shall have power to establish agencies in Tennessee or elsewhere, and power “to do and perform all other things necessary to promote the objects” of the grant. It is silent as to any other mode or means, by which the rights of the corporation shall be used or enjoyed, and leaving this matter to the corporation, expressly grants to it indefinite powers to do all other things necessary to promote the objects of the incorporation. A restriction however is imposed to this extent, that it shall not “exercise banking privileges” or “issue bills of credit” or put in circulation any note, draft, check or change ticket intended, or the tendency of which will be, to “circulate as change or currency.” Now it is evident, that these prohibitions, resolve themselves simply into one, and that is, that the corporation shall not exercise the powers and functions of banking. It shall not issue bills of credit, or put in circulation other paper intended, or the tendency of which, will be, to circulate as change or currency, that is, it shall “not exercise banking privileges.” It does not deny to the corporation, the right to be a party, as maker or holder to any note, draft or check, but only that it shall not issue such paper or bills of credit, or change tickets, with the intention, that it shall circulate as currency. In other words, the prohibitions are directed, not against particular acts, but against a business or pursuit.
We think it very clear, that the corporation as an Insurance and Trust Company, had the right to borrow money, receive deposits, draw or purchase drafts or checks in its proper business, as incidental powers necessary to the proper use and enjoyment of its franchise, and that any such transaction, *22 would be valid and obligatory upon it. There are no restrictions in the charter, denying it the right to do any of these acts; on the contrary, it expressly confers the power to do any act or thing, necessary to promote the objects of the charter.
In Angel and Ames on Cor., ch. 8, sec. 12, it is said that “in general an express authority is not indispensable to confer upon a corporation the right to become drawer, indorser or acceptor of a bill of exchange, or to become a party to any other negotiable paper.” It is sufficient, if it be implied, as the usual and proper means, to accomplish the purposes of the charter. Story on Bills, sec. 79, 2 Kent’s Com., Lec. 38, page 239; Broughton vs. Manchester Waterworks Co., 3 Barn. & Ald. l.
In the Union Bank vs. Jacobs, 6 Hum. R., 525, Turley, J. in delivering an able opinion on this subject, says, that “a corporation is in the estimation of law, a body created for special purposes, and there is no good reason why it should not, in the execution of these purposes, resort to any means that would be necessary and proper for an individual in executing the same, unless it be prohibited by the terms of its charter, or some public law from so doing.” In further illustration of this subject, we shall merely refer to Ang. and A. on Cor., 92; Chester Glass Co. vs. Dewey, 16 Mass. R., 102; Baird vs. Bank of Washington, 11 Serg. and R., 418.
Now, by what agency or means could the proper objects of the corporation be effected; its funds be secured, remitted or transferred; its trusts, however numerous or various, be executed; its investments be made in stocks, or otherwise, as allowed by the charter; and its business and interests as an Insurance and Trust Company, be managed and conducted at different, and often, at distant places, if we deny to it the rights and powers before stated? We see no reason why it should not employ the usual and appropriate means, which a natural person might employ, to effect any of these objects. *23 And the right to draw checks and drafts creates a necessity to provide agencies, procure acceptances, and provide ways and means for the honor of its paper. Without pursuing this part of the subject further, it seems to us, that so far as relates to the question of competency and power, the corporation had the competency, power and capacity to be a party to any of the contracts and agreements stated in the bill. That is, we do not think that those transactions should be held as void, for the want of any competency in the corporation, as one of the parties, to enter into them, as in the case of a minor or feme covert, whose contract is to be considered as void for want of competent power to make it. But, nevertheless, those transactions remain subject to the other question, the question of illegality, in the same manner as if they had been the acts of a natural person, subject to similar restrictions as those imposed upon the corporation.
It is agreed that the transactions stated in the bill are illegal, because they contravene the restrictions contained in the charter of the Nashville company, and also the restrictions and policy of our restraining law of 1827, ch. 85. Under this law (1827) no person has the right, unless indeed he have a grant from the State, to establish any banking institution, or to issue any notes, bills or other paper, for such purpose.
The business of banking may consist, as is well known, in receiving deposits, in loaning and borrowing money, and in buying and selling exchange, which is usually effected by drafts, checks and other paper. That is, banking, when viewed in detail, may consist in a series and succession of acts of this character, intended to be pursued and continued as a business and occupation. It was a common law right, which any person might lawfully exercise, until it was restrained by the act of 1827, upon considerations of high public policy and interest. 2. J. C. R. 377. Attorney Gen *24 eral vs. Utica Insurance Company. But it is to be considered, that the prohibition goes to the business and occupation of banking, and not to any one or more of the acts in detail, before stated: and therefore, any person may, in many transactions of like character, borrow or loan money, and be a depositary of money, buy or sell exchange, and be the drawer or holder of any kind of commercial paper, as notes, bills and drafts, provided, that it be not in the business and pursuit of banking. The same may be said of the corporation in question : it has the corporate capacity, as we have seen, to do any of the acts before enumerated, as a natural person has capacity to do the same, and they will be held alike obligatory upon each. The question under the law is, whether the corporation or person is engaged in the business of banking, or in other words, whether the acts in question taken together, do constitute the business and pursuit of banking. For the prohibition, goes not to the acts in detail, but to the business or pursuit to which they have reference. We have before considered the nature and extent of the restrictions, in this respect, contained in the charter, and it will be seen, that they are in substance and effect, the same as those contained in the general law of 1827, and founded upon the same considerations of public policy and interest.
The law of 1827, establishes a local policy for the State, and can have no inherent force or effect beyond its limits : it does not therefore, apply to, or in any manner, o|Fect the present transaction, because the contracts stated in the bill were made, and to be executed, in a foreign State, that is, in the State of New York. But as to the restrictions incorporated in the charter of the Nashville Company, they have no reference to any limits or locality, but restrain the action of the corporation, wherever it may, by comity, be permitted to exercise its powers and functions. These restrictions, *25 do therefore apply with full force, to the transactions stated in the bill.
There is no question, but that it was perfectly competent for the corporation to exercise all, or any of its powers, in the State of New York, or other foreign State, provided, that it did not violate the public law or policy of such State. A corporation may be said to have its residence in the State where it is created, and it cannot migrate from it; because “ it exists only in contemplation of law and by force of law, and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence.” But its existence in the State, where it was created and resides, is re-cognised in foreign States, and like a natural person, it may by its agents, make any contract or do any act in a foreign State, without the scope of its limited powers, which is not prohibited by the foreign State. This is a well settled principle, founded in the comity of States. Bank of Augusta vs. Earle, 13 Peters R. 521.
Now as to the character of these contracts, and dealings, between Yermilye and Norvell, the agents of the two corporations, construing the charter as we do, and as it was construed by this Court on a former occasion, there can be no question, but, that they were in contravention of the restrictions contained in the charter of the Nashville Company, and were an abuse and perversion of its powers to purposes not intended by the act of incorporation. It was a dealing in exchange for profit, as a business and occupation.
It is true, that Yermilye had no actual knowledge of the corporate restrictions referred to, and that he acted upon, and acceded to the propositions of 'Norvell, in full faith and confidence, that they were authorised, legal and proper, and that the engagements, he had undertaken to perform for Norvell, were legitimate and proper.
But taking it for granted, that the law imputes the notice *26 of these restrictions : how then will stand the case in reference to the question of illegality ? The plaintiff could not be involved in it, unless it further appear, that its agent had actual notice that defendant was dealing in exchange as a business, and occupation, and that the acts and things that Norvell, the agent, engaged him to do, were connected with and in the performance of that illegal business.
If Vermilye had such knowledge, it would follow, that in acceding to Norvell’s propositions; and undertaking to perform the offices and duties that he did perform, he concurred with Norvell in a breach of the restrictions contained in the charter of the Nashville Company.
This concurrence places him certainly at fault, but in our judgment, not by any means in equal fault, iwpari delicto, with the other party. Norvell was the principal offender, and the corporation ratified and approved his acts. The prohibition was pointed specially at the corporation, was intended to limit and restrain its action, and to protect persons having any transactions with it, against fraud, imposition or other deceitful practice. It was intended likewise to guard and protect the public interest against the very injurious consequences that must necessarily result from irresponsible banking, and a doubtful and spurious circulating medium.
Upon these grounds therefore, and in view of the principles and cases before referred to, which we need not repeat; we think it very apparent, that the complainant was not in pari . delicto, with the defendant in the transactions stated in the bill.
. We may further observe, that ordinarily, there is great inequality in the condition of parties, situated as these were: for, as a matter of fact, no one except the agents of the corporation, as it seems to us, could be well advised of the nature and character of its business, and whether a given transaction was or was not in violation and ' fraud of the restrictions contained in the charter.
*27 It is very true that every one must be held to a • knowledge of the law. But -that is not the question. It is, whether, the law being known or the prohibition being known, a given state of facts exists: whether, for instance, the corporation is in the exercise of prohibited powers, and whether a given transaction is under the ban of such prohibition. We cannot doubt, but that in this respect, the parties do occupy very different and unequal ground.
We have seen, that in general, where there is great inequality in the circumstances and condition of the parties to an illegal contract, which we conceive to be the present case, the principle is, that they are not to be held as in pari delicto.
We are of opinion therefore that the complainant is not repelled, by reason of the illegality relied upon in defence, but is entitled to relief: and that in granting it, the court will promote both the claims of private justice and the ends of public policy.
It is to be observed however, that the relief is against the contract, and not upon the contract: for, we have seen that in the nature of things, the law cannot enforce an illegal contract, although the parties be not in pari delicto. But it is consistent with itself, that the law shall annul such contract, and place the parties in all respects in statu quo.
We shall briefly dispose of the remaining questions in the case.
2. And in the next place, in what manner and to what extent are the defendants liable ?
It is insisted by complainant’s counsel, that the persons who are the stockholders in the Nashville Company are liable, not as corporators, but in their individual and natural capacity, for the demands stated in the bill.
In support of this position, it is assumed that Norvell *28 was their agent, and that in said transactions with the complainant, he perpetrated a fraud, for which his principals, said stockholders, are personally liable: and it is also assumed that the stockholders are liable on the ground of partnership.
Now, we have seen, that it was the corporation and not the persons, who were its stockholders, that executed the power of attorney to Norvell, and that he professed to act under that power for the corporation, and not for the persons who were the owners of its stock. But it is argued, that the corporation had no such power or authority under its charter as Norvell assumed to exercise, and for want of competency was not bound by his acts: that the persons acting as the directory of the corporation, were in legal effect, the agents of the stockholders in their private capacity, and as such ratified and confirmed the acts of said agent: that the stockholders received whatever advantage there was, accruing from the acts of said agent, and that, as the corporation was not bound and could not be bound thereby, for want of any inherent power to enter into those transactions, either by itself or its agent, it follows, that the stockholders in their private capacity, must be regarded as the principal of said agent and be bound by his acts. For the same reason, it is likewise insisted, that as the stockholders were not acting in conformity to or under the protection of the charter, their acts, in this respect, must be held obligatory on them as natural persons associated on the principle of partnership.
Now the whole argument is based upon the assumption, stated in the bill, that the contracts made by Norvell in the name of the corporation, were not the business of the corporation proper, but of the stockholders, who thus formed an association, amounting in fact to a partnership, for the purpose of carrying on that kind of business.
*29 We do not understand it to be assumed, nor is there any thing in the case to warrant the assumption, that the persons owning the stock in said corporation, did, by any voluntary act and purpose, form a partnership or association to carry on the business of exchange in the name of the corporation, as a separate and distinct business, in addition to the proper and legitimate business of the corporation; but that, not so intending, but only intending to do a corporate business, in the name of the corporation, they assumed and exercised powers, not conferred by the charter, as to which, from legal necessity they are liable, and liable as partners; becausé, in point of fact, Norvell professed to act as the agent of the corporation, in virtue of the power exhibited to the plaintiff’s agent, who likewise understood that he was contracting with the corporation : nor did it occur to the mind of the agent of either party, that the stockholders were a party to said contracts, in any sense, other than as corporators. In point of form, the contracts were made with the corporation, and so in fact, were they intended by the agents, who negotiated them.
Now if the legal effect correspond with the form and the original and actual intention; if the corporation, having a legal competency to make the contracts, has incurred to the fullest extent, whatever obligation they were intended to impose, then it is evident that the whole argument, asserting the personal responsibility of the stockholders, must fall to the ground.
We have seen in a former part of this opinion, that the corporation had power under its charter, to borrow money, draw or purchase drafts or checks, and provide agencies for their acceptance and payment as incidental to the proper use and enjoyment of its franchise ; and in a word, that so far as relates to the question of power, the corporation had the power and capacity, as an other person, to be a party to *30 any of the contracts and agreements stated in the bill, and that it has incurred whatever obligation they were intended to impose.
Whether those contracts were made in violation of public policy, is a different question, not going to the powers inherent in the corporation, in virtue of its charter. This latter question would be alike applicable to natural persons as to this corporation, and it arises only upon an abuse of conceded powers to purposes and objects which are prohibited.
It follows therefore, that Norvell was not the agent of the stockholders in their private and natural capacity, and that they are not, in this character, bound by his acts. But on the contrary, the corporation, as such, was the principal, and has incurred whatever responsibility properly belongs to the acts of Norvell, in the performance of his agency.
As to the liability of a corporation for the acts of its agents, that depends upon well settled principles, applicable to the relation of principal and agent. A corporation whether municipal or private, is liable, like a natural person, for the contracts, frauds and torts of its agent. It must of course be understood, that the acts of the agent, which impose a liability on his principal, either ex contractu or ex delicto, must be in the performance of or connected with the business of the agency. Thayer vs. Boston, 19 Pick, R. 513; Yarborough vs. Bank of England, 16 East, 6; Smith vs. Birmingham Gas Light Company, 1. Adol and Ellis, 526; Clark vs. Washington, 12, Wheaton, 40; Baker vs. Boston, 12.Pick, R. 184; Fowle vs. Alexander, 3 Peters, 409.
And so, on the other hand, it may be observed, that the officer or agent of a corporation is liable to the corporation for all damages occasioned by his violation of the duties and obligations he owes to his principal, whether it consists in positive misconduct or neglect or omissions. Ang. and A. *31 on Cor. 251; Robeson vs. Smith, 3 Page, R. 232; 2. Atkins, R. 406.
Assuming then, that the stockholders are not liable upon the grounds or to the extent contended for by complainant’s counsel, yet we are of opinion that they, the stockholders, are liable personally to the extent of their stock.
We have seen in construing the charter of the Merchants* Insurance and Trust Company ,of Nashville, that the 7th section of the charter of the Knoxville Company, (act 1838, ch. 206,) forms a component part of the charter of the former company, and that it provides “ that the individual property both real and personal of every stockholder in said institution shall be held and bound for the payment of the debts of said corporation, to the full amount of his or her stock in said corporation.” The 6th section of the same charter confers upon the corporation the right to invest its capital stock in certain other stocks or to loan the same on real or personal security.
Now the capital stock is a trust fund, provided and intended to be safely kept for the security and benefit of creditors of the corporation, and is subject to be used and applied only in conformity to the provisions and permissions of the charter. It is upon general principles, the duty of the stockholders, to pay in the stock, or if there be any special provisions in that respect in the charter, of course they are to be complied with. The stock subscribed and agreed to be paid, becomes the property of the corporation, and its directory, who may be regarded as the trustees of the fund, have the right, and in a court of equity at the instance of a creditor, may be required to enforce its payment. Briggs vs. Penneman, 8 Cow. R. 396. As regards the interest of the stockholder in the capital stock, it is not a chattel interest, but is in the nature of a chose in action, being a mere right to demand the dividends as they become due, and at the disso *32 lution of the corporation to demand its return or the residue thereof, after the claims and demands of creditors shall have been first satisfied. The interests of the corporation and stockholders, in this fund, is to be regarded in all respects, as subordinate to the claims and demands of creditors. They have no right to withdraw it, or in any-wise to endanger, impair or diminish it, to the prejudice of the superior claims of creditors. A. and A. on Cor. ch. 16 and ch. 17. 4 Ves. 751. 9 Ves. 177. Brightwell vs. Mallory, 10 Yer. R. 190. Wood vs. Dumner, 3 Mason R. 308.
In the present case, the corporation by its charter, was permitted to use its capital, the trust fund, in a given manner, supposed to be least hazardous to the rights of creditors, and to make it available in dividends and interest; but to compensate the risk to creditors, the charter imposes upon the stockholders the personal responsibility for the capital, to which we have alluded.
It was not the intention of the charter that the capital stock should be carried into the business of the corporation, and form a part of its general assets; because the charter prescribing a given mode in which it may be used, impliedly excludes any other, and if used in any other manner than that permitted, it would be equivalent to a withdrawal of the fund.
But the intention was that the stock should be kept seperate and apart from the other funds and business of the corporation, subject only to be invested and used in the manner before stated, and be always ready in its distinctive character as stock, to meet the debts of the corporation. Nor was it the intention that creditors should be necessarily involved in any question touching the manner in which the corporation may have used the stock. The liability of the stockholders depends upon no contingency, but is perfect and absolute, *33 whether the corporation have abused its privilege or not. The statute makes the individual property of every stockholder liable for the debts, to the extent of his stock: and this liability imposed by statute, is cumulative to the liability of the stock, which is so liable as we have seen upon general principles.
In Briggs vs. Penneman, in the court of errors of New York, 8 Cow. R. 395, Spencer, Senator, says, alluding to the capital stock, “ this being corporate property, is a fund for the benefit of creditors, existing entirely independent of any statutory provision. Then comes the act (1 R. L. 247,) which declares that in the event of a dissolution, the stockholders at the time, “ shall be liable to the extent of their respective shares of stock held in such company and no further.” Surely the Legislature did not mean to declare, that the stockholders should be liable, as they had already agreed to be liable and as they were liable at common law. Something more was intended, and it is to my mind very clearly expressed, that the extent of the stock held' by them, should be the measure of their individual liability to creditors. The statute does not refer to them in their corporate capacity, but as individual stockholders : and it declares their liability without reference to the amount they may have paid in on their stock.”
It will be further observed that the charter makes the entire property, real and personal, of the stockholder, liable; thus including every thing upon which a personal responsibility could be enforced. Its efiect therefore is, to impose a personal liability upon the stockholders to the extent of their stock, and a lien upon their property, both real and personal for its security and payment.
But this liability is, in its nature, several, and limited to the amount of their stock respectively. Brightwell vs. Mallory, 10 Yer. 198; Crease vs. Babcock, 10 Metc. R. 557.
*34 As to the effect of the deed of assignment upon the capital stock, we may observe, that it is not expressly included in that assignment, and considering its distinctive nature and character, and that it could not properly form any part of the general assets of the corporation, we are of opinion that the capital stock is not in any wise included in or affected by the deed of assignment: if indeed, it could properly be the subject of such assignment, which we are by no means prepared to admit.
3rd. In the last place it is said the bill is multifarious.
It makes the persons who compose the members of the corporation parties and seeks to impose upon them a personal liability in their private capacity and independent of the charter, to the extent of the complainant’s demand. It makes the same persons parties in their corporate capacity, and seeks to enforce against them a liability as corporators, to the extent of the capital stock of the company: it makes the corporation, as such, a party, and seeks to enforce against it a liability, not as upon the contract stated in the bill, but upon the ground ol fraud : it makes the trustees in the deed of assignment parties, and impeaching it for fraud, seeks to set aside the assignment and to subject those assets to the payment of complainant’s claims. Now, the question is, whether the various subjects and parties, may all be united in the same record, as one suit ? • And we are ■ clearly of the opinion that they cannot.
If a bill “ seek to enforce different demands against persons, liable respectively, but not as connected with each other, it is clearly multifarious,” (per Lord Eldon, in Saxton ys. Davis, 18 Ves. 79,) but if there be a common interest in the plaintiffs, and the defendants represent, and are interested in all the different questions raised in the record, and the suit have a common object, it is not to be considered as multifarious. Campbell vs. Mackay, 1, Mylne and Craig, 603. *35 The interest alluded to must not be remote and consequential, but such as will be affected and concluded by the decree. Story, Eq. PI. sec. 140, 226.
Now as to the deed of assignment,- that is one thing in which the trustees are interested, and it is their duty to defend the deed and administer the assets placed in their hands in conformity to its directions. But what interest have the trustees with the other subjects and issues sought to be litigated in the same bill ? Most certainly, none whatever. The question of fraud and partnership, on which grounds an individual and personal liability is sought to be imposed upon other defendants, independent of any liability under the charter, form a separate and distinct subject, and require allegations and proof, as to which the trustees representing the assignment have no interest or connection. Now have those persons thus sought to be made liable upon grounds independent and distinct from the charter, any direct connection with the litigation as to the deed of assignment. The contest between the complainant and those parties is, whether they are liable upon the facts and grounds assumed in the bill; that is, upon the grounds of fraud and partnership.
This issue is not in any wise connected with the issue proposed to be made with the trustees, as to whether the deed of assignment is fraudulent as to creditors. The hypothesis, that if the assets named in the deed were applied to complainant’s debt, it would pro tanto exonerate those defendants, and that they are interested in seeing them so applied, cannot vary the case; because, the question is not, whether they may be exonerated by the application of another fund, but whether they are liable at all, and besides, their position as defendants does not authorise them to assume or assert any such pretended equity. As relates to the contest with these parties, would the bill have been defective for want of *36 parties, if the trustees and the interest they represent, had been omitted, and on the other hand, would a bill impeaching the assignment for fraud and malting the corporation and trustees parties, have been defective, if those other persons named as defendants, had been omitted ? We think most clearly not, in either case.
We have seen, that the bill seeks to subject certain defendants, upon' the ground of fraud and partnership, assuming that the contract was in effect, not made with the corporation, but with those defendants. This is a distinct ground, not dependent upon the relation which the defendants, as stockholders, sustain to the corporation, and it would result, if maintained, in their personal liability to the extent of complainant’s demands.
But failing in this, the bill further seeks, to make those same persons liable in their corporate character, to the extent of the capital stock upon the ground that the plaintiff’s demand is against the corporation, as upon a contract made with the corporation, and that the stockholders are liable for its debts to a certain extent.
Now it seems to us, that in this respect, the bill is defective : it is blending in the same record two separate and distinct cases, or an incongruous statement of the same case. For, it is very evident, that if the contract on which the complainant relies, was made with the corporation, then, the corporation is liable, and those defendants are liable in the character and to the extent before stated. Here is a simple and distinct case, in itself. It is equally evident, that in such case, they would not be liable as partners.
,We think it very clear that the bill is multifarious, and without extending the argument further, shall merely refer to some of the cases, illustrative of the doctrine on this subject. Brophy vs. Jamieson, 2 Molloy, 404; Whaly vs. Dawson, 2 *37 Sch. and Lef. 367; Campbell vs. Mackay, 1 Mylne and Craig, 603; Ward vs. Duke of Northumberland, 2 Aust. 469; Dunn vs. Dunn, 2 Simons, 330; Salvage vs. Hyde, 1 Jacob, 151.
The bill will be dismissed without prejudice.
*39 GASES ARGUED AND DETERMINED IN THE SUPREME COURT OF TEIIESSEE. KNOXVILLE: SEPTEMBER TERM, 1850.